IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:22-CV-69-FL

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)     ORDER<br>COREY CARROLL, )<br>)<br>    Defendant. ) | |

This matter is before the court on defendant's motion to suppress (DE 116).[1] Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, United States Magistrate Judge Robert B. Jones, Jr. entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motion to suppress be denied (DE 143). Plaintiff filed objections to the M&R. In this posture, the issues raised are ripe for ruling. For the following reasons, the court adopts the M&R and denies defendant's motion.

### STATEMENT OF THE CASE

Indictment returned May 18, 2022, charges defendant with three counts: 1) conspiracy to distribute and possession with intent to distribute five kilograms or more of cocaine and 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846; 2) possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1); and 3) possession with intent to distribute a quantity of cocaine and a quantity of fentanyl, in violation of 21 U.S.C. § 841(a)(1).

---

[1] This matter was reassigned to the undersigned August 19, 2025.

Defendant filed April 2, 2023, a motion to suppress evidence that he claimed was seized in violation of the Fourth Amendment. (DE 44). Following hearing, the court denied that motion June 16, 2023. Defendant entered a plea of not guilty as to all counts November 4, 2024, and trial was set to commence February 10, 2025. After a continuance of trial, defendant filed several pretrial motions, including the May 22, 2025, instant motion to suppress three telephonic communications which defendant asserts were unlawfully intercepted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 et seq. The government responded in opposition July 14, 2025.

After this matter was reassigned to the undersigned, the court referred to the magistrate judge the instant motion to suppress for recommendation and defendant's remaining pretrial motions for disposition. Following telephonic scheduling conference August 21, 2025, the court discontinued trial, pending resolution of defendant's motions.

The magistrate judge held hearing September 3, 2025, and entered the instant M&R September 25, 2025, wherein it is recommended defendant's motion to suppress be denied.[2] After extension of time, defendant filed objections October 21, 2025. The government did not respond to defendant's objections, and the time to do so has expired. In addition to defendant's objections filed by counsel, the court received two letters from defendant regarding his motion (DE 148, 150).[3]

## STATEMENT OF FACTS

The court incorporates herein the relevant facts as more particularly set forth in the M&R:

At the September 3, 2025 suppression hearing, the Government presented

---

[2]  The magistrate judge also resolved the remainder of defendant's motions then pending.

[3]  The court does not address issues raised in defendant's pro se letters where defendant "has no right to raise substantive issues while he is represented by counsel." United States v. Washington, 743 F.3d 938, 941 n.1 (4th Cir. 2014).

2

two witnesses: James Mobley, the current Beulaville Chief of Police, who at the time of the events in question was a lieutenant with the Duplin County Sheriffs Office ("DCSO") in the vice and narcotics section and a DEA task force officer ("Chief Mobley"); and William Smith, II, a detective with the DCSO ("Detective Smith"). The Government introduced three exhibits at the hearing: an audio/video recording of a confidential informant's ("CI") phone call with [d]efendant, (Ex.1); an audio/video recording of the Cl's subsequent phone call with [d]efendant, (Ex. 2); and a photograph of the Cl's phone showing an outgoing call to "J Ville," (Ex. 3).

    i. Hearing Testimony

        1. Chief Mobley

On March 15, 2022, Chief Mobley was contacted by a highway interdiction team that had arrested an individual, the CI, with a large quantity of narcotics. Hr'g Tr. [DE-140] at 7:8-12. The CI initially tried to flee the scene but was ultimately tased and subdued by law enforcement. Id. at 36:14-22. The CI then expressed interest in cooperating with law enforcement and was transported to the DCSO for an interview. Id. at 7:20-24. The CI was placed in an interview room that contained recording equipment in the form of a camera covered by a globe in the corner of the room. Id. at 8:6-13. Although the CI was not told by Chief Mobley during the interview that it was being recorded, Chief Mobley believed the CI understood that it was because the camera was in plain view. Id. at 46: 15-47:1. Chief Mobley and the CI initially discussed the CI cooperating with law enforcement; as part of that cooperation, the CI showed him phone numbers of drug contacts in the Cl's phone, including [d]efendant's number that was under the name "J Ville." Id. at 8:18-9:4, 10:3-5, 16:16-17. The CI also indicated the narcotics discovered during the arrest were intended for delivery to [d]efendant, so Chief Mobley and the other officers formulated a plan to have the CI call [d]efendant to set up a controlled delivery of narcotics. Id. at 9:8-22, 10:23-11:4.

While the CI was initially going through the CI's phone contacts with law enforcement, the CI inadvertently called [d]efendant's number but hung up before [d]efendant answered (Call One). Id. at 10:6-14. Defendant called the CI back, but the CI did not answer; however, at the direction of law enforcement, the CI called [d]efendant again and told [d]efendant the CI would be there in a couple of hours (Call Two). Id. at 10:17-22, 13:20-14:24. The phone calls were recorded by Detective Smith on his cell phone. Id. at 11:4-12:9. The CI showed the number dialed so it could be seen on the recording, then Detective Smith placed his cell phone next to the CI's cell phone for the duration of the call. Id. at 12:10-15. The CI made the phone calls on speaker so the investigators present in the room could hear the conversation. Id. at 12:16-19. Chief Mobley and the other officers then planned for the CI to make further contact with [d]efendant to set up the controlled delivery. Id. at 17:19-22.

3

Chief Mobley asked the CI to get [d]efendant to talk about the narcotics and the money exchange during the conversation, and Mobley advised Detective Smith, in the presence of the CI, to make sure the call was recorded. Id. at 17:23-18:10. The CI stated that the phone call needed to be made on Face Time, so the CI was escorted from the interview room outside to the back patio of the DCSO. Id. at 25:6-11. The CI, who was seated in a chair, proceeded to call [d]efendant in the presence of law enforcement, and Detective Smith was standing directly in front of the CI recording the call with his cell phone (Call Three). Id. at 26:1-14, 32:14-33:5. The CI, as directed by Chief Mobley, concocted a story to explain why someone unknown to [d]efendant ( an undercover law enforcement officer) would be driving the CI to deliver the narcotics to [d]efendant. Id. at 33:10-34:1, 45:9-21.

The CI was Mirandized and waived the associated rights but was not charged with a crime on the date at issue. Id. at 37:16-23. The CI required the use of supplemental oxygen and spoke as if struggling to breathe during the approximately two-hour interview by law enforcement. Id. at 37:1-4, 37:24-38:11. Throughout the interview, law enforcement sought consent to search the Cl's phone, which was ultimately given after the CI spoke directly with Chief Mobley. Id. at 38:13-39:4, 40:21-41:2. There was not a separate form documenting the Cl's consent to making the controlled calls, but the CI made the calls in the course of cooperating with, and at the direction of, law enforcement. Id. at 41:12-22. Chief Mobley told the CI the case could go federal but did not recall saying the CI could receive life in prison. Id. at 41:3-11. The CI was taken to the DCSO as opposed to the jail because law enforcement was planning to use the CI for a controlled delivery and wanted to avoid other inmates at the jail, and law enforcement wanted to convey that they were trying to work with the CI. Id. at 42:19-43:7. The CI was used as a local informant and did not sign any paperwork with the DEA. Id. at 43:18-23. Chief Mobley was not familiar with the CI or [d]efendant prior to the events of that day. Id. at 45:22-46:4.

2. Detective Smith

Detective Smith was present on March 15, 2022, at the Cl's roadside arrest, during the Cl's interview, and during the phone calls between the CI and [d]efendant. Id. at 48:21-23, 52:15-21, 54:9-20. The CI did not have supplemental oxygen with him in the interview room, so EMS was contacted to obtain it, but Detective Smith did not recall whether the CI had the oxygen during the Third Call. Id. at 55:7-13. Prior to the Third Call, Chief Mobley instructed Detective Smith, in the presence of the CI, to walk the CI outside and to record the phone call between the CI and [d]efendant. Id. at 49:5-14. Once outside, the CI sat in a chair and phoned [d]efendant in an attempt to set up a controlled delivery of narcotics, and Detective Smith held his cell phone in front of the CI, where it was plainly visible, and recorded the conversation. Id. at 49:15-51:14. Detective Smith could not say whether the CI was expressly asked for consent to make or record the controlled calls, but Smith understood the CI consented to making the calls, as well as the calls being recorded, because the CI held the phone toward Smith's phone so the screen

4

showing the name "J Ville" could be recorded, the CI placed the call on speakerphone, and the CI did not object or direct Smith to stop recording. Id. at 55:15-25.

(M&R (DE 143) at 5-8).

## DISCUSSION

A.    Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). It does not conduct a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations."[4] Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely objection, the court reviews only for "clear error," and need not explain its reasoning for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.    Analysis

Title III prohibits unauthorized interception of "any wire, oral, or electronic communication," and if a communication is intercepted in violation of Title III, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence." 18 U.S.C. §§ 2511(1)(a), 2515. However, "a person acting under color of law" may intercept a wire, oral, or electronic communication if "one of the parties to the communication has given prior consent to such interception," (the "consent exception"). Id. § 2511(2)(c).

---

[4] Internal citations and quotation marks are omitted from all citations unless otherwise specified.

5

Although the CI did not provide express written consent prior to the phone calls, the magistrate judge finds that "the CI implicitly consented to the recordings." (M&R (DE 143) at 10). The magistrate judge relies on hearing testimony indicating that:

> the CI wanted to cooperate and initiated the calls at the direction of law enforcement, the CI was present when Chief Mobley directed Detective Smith to record the calls, the CI held the phone in such a way that Detective Smith could not only see but also record the name on the CI's phone screen, the CI placed the calls on speakerphone, and Detective Smith place the recording device directly next to the CI's phone during Call Two and held the recording device directly in front of the CI during Call Three so that it was obvious the calls were being recorded.

(Id.). Because this testimony shows that the CI intended to have his calls recorded, the magistrate judge find that "under the circumstances presented . . . the CI knowingly and voluntarily consented to the phone calls with [d]efendant being recorded by law enforcement." (Id. at 11). Accordingly, the magistrate judge recommends denying defendant's motion to suppress because the phone calls were lawfully intercepted under the consent exception.

Defendant objects, arguing that "the [g]overnment has failed to meet its burden of proving that the CI's consent in this case was truly voluntary and knowing under the totality of the circumstances." (Obj. (DE 147) at 2-3). Specifically, defendant contends that coercive circumstances around the CI's arrest and interrogation render his consent involuntary, arguing that "cooperation motivated by fear of prosecution or hope of leniency is not equivalent to free, voluntary consent." (Obj. (DE 147) at 3). Defendant relies on Schneckloth v. Bustamonte, 412 U.S. 218 (1973), for the proposition that implied consent cannot be the product of coercion, duress, or deception. In Schneckloth, the Court held that consent to a warrantless search must be "voluntarily given, and not the result of duress or coercion, express or implied." Id. at 248; Assuming without deciding that this mandate also applies to consent to interception of communications, this does not change the court's analysis. Determination of the voluntariness of

6

an individual's consent to search "is a question of fact to be determined from the totality of all the circumstances." Id. at 227; accord United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996).

In determining whether a defendant's confession was voluntary, courts consider factors such as "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Schneckloth, 412 U.S. at 226. However, none of these factors are dispositive, and each must be considered in conjunction with "a careful scrutiny of all the surrounding circumstances." Id.

Here, the totality of the circumstances indicate that the CI voluntarily consented to Detective Smith recording the phone calls with defendant because the evidence does not support defendant's contention that "law enforcement created an inherently coercive environment." (Obj. (DE 147) at 3-4). "Truthful statements about [an arrested individual's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir. 1987). Thus, Chief Mobley's mention of potential federal charges does not signify undue coercion or pressure. Nor is there any indication in the record of specific promises of leniency in exchange for the CI's cooperation and consent to record. Therefore, there is no error in the M&R's finding that the CI voluntarily consented to the recordings.

Defendant next asserts error in the finding that the CI's consent was given knowingly, contending that "the CI's ability to make calm, reasoned decisions was significantly impaired" by his difficulty breathing. (Obj. (DE 147) at 5). Because the CI required supplemental oxygen, EMS was called to address that medical need. (Tr. (DE 140) at 55:9-10). There is no indication that the supplemental oxygen was withheld or conditioned on the CI's cooperation. Nor is there evidence

7

that the CI's mental state was altered. Thus, where the magistrate judge had the benefit of hearing the recordings of the CI's voice and assessing his ability to breathe, the court is not inclined to depart from the magistrate judge's assessment that there is "no support in the evidence for [d]efendant's argument that the CI's physical condition prevented meaningful consent." (DE 143 at 10-11).

Finally, defendant asserts that the analysis in the M&R did not appropriately apply the law of voluntariness or "address how the CI's custodial, vulnerable status affected his ability to refuse." (Obj. (DE 147) at 9). Defendant argues that the M&R improperly discounts the CI's initial flight from law enforcement. Although the CI initially attempted to flee law enforcement and subsequently was tased and handcuffed, the CI expressed interest in cooperating prior to being transported to the DCSO. (Hearing Tr. (DE 140) at 7:20-24). "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." United States v. Watson, 423 U.S. 411, 424 (1976). Where there is no evidence of threats or coercion upon the CI's arrest, the court is not persuaded that the CI's decision to cooperate was prompted by anything other than "the fact of custody alone." Id.

Defendant points to Arizona v. Fulminante, 499 U.S. 279 (1991) as an example of a confession being found involuntary because it "was tendered in the belief that the defendant's life was in jeopardy if he did not confess." Id. at 286. However, there is no indication in the record that the CI had any credible fear when he allowed Detective Smith to record his phone calls. Accordingly, the court finds no error in the magistrate judge's application of the consent exception.

The court has examined carefully the rest of the M&R for clear error in light of the underlying record and briefing. See Diamond, 416 F.3d at 315. Finding none, the court adopts the recommendation of the magistrate judge as its own.

8

## CONCLUSION

Based on the foregoing, the court ADOPTS the recommendation of the M&R (DE 143) and DENIES defendant's motion to suppress (DE 116).

SO ORDERED, this the 12th day of December, 2025.

                                                                       LOUISE W. FLANAGAN
                                                                       United States District Judge